[Crim. No. 74.   Third Appellate District.—February 9, 1909.]

# THE PEOPLE, Respondent, v. AMERICO BALDOCCHI, Appellant.

CRIMINAL LAW—MURDER—SELF-DEFENSE—INSTRUCTION WARRANTED BY EVIDENCE.—*Held*, upon appeal from a judgment of conviction of the defendant for the crime of murder, that, notwithstanding defendant's testimony to self-defense, the evidence adduced upon the trial fully warranted the court in instructing the jury: "If you believe from the evidence that, at the time of killing, the defendant could, with safety to himself, have avoided such killing, and that defendant knew, or as a reasonable man could have known, that he could, with perfect safety to himself and his person, have avoided such killing, then if you find all these facts, the defendant cannot justify such killing on the grounds of self-defense."

ID.—RIGHT OF DEFENDANT ASSAILED TO STAND GROUND—INSTRUCTION—APPLICABILITY.—It is not a ground of objection to the foregoing instruction that it did not present the law as to the right of a defendant assailed to stand his ground against an aggressor, when other instructions gave the defendant the full benefit of the law on that subject. Yet it may be doubted whether the facts as they appeared, even giving all reasonable weight to defendant's testimony, would warrant the application of that rule at all; it appearing that the killing was a brutal, cold-blooded murder without semblance of justification on the ground of self-defense, and that to hold deceased to be in any sense an aggressor would be a gross distortion of the facts.

ID.—PRIOR ASSAULT TO AVENGE INSULT TO WOMAN—END OF AFFAIR—AMPLE TIME TO COOL BLOOD—MOTIVE OF KILLING.—When the affair of a prior assault made by the deceased without a weapon, to avenge an insult by defendant to a woman, had come to an end, and deceased was no longer an aggressor, and defendant had ample time to cool his blood, if such prior affair can be brought into the question at all, it tends merely to furnish the probable motive of the killing, as having been in retaliation for the prior assault by deceased after he had ceased to be the aggressor.

ID.—EVIDENCE OF PREVIOUS GOOD CHARACTER—AID OF PRESUMPTION OF INNOCENCE—PROPER REFUSAL OF REQUESTED INSTRUCTION.—Evidence of good character is admissible as coming to the aid of the presumption of innocence, and as bearing on the question whether guilt is proved beyond a reasonable doubt; but it was proper to refuse a requested instruction that "the defendant's character outweighs the evidence against him, even if the evidence outside of the evidence of good character conclusively establishes his 'guilt."

ID.—INSTRUCTION GIVEN NOT REQUIRED TO BE REPEATED.—When the court had properly instructed the jury upon the weight to be given to evidence of the previous good character of the defendant, it was not required to give so much of a requested instruction on that subject as repeated the charge given.

ID.—EVIDENCE—CROSS-EXAMINATION—TURNING OF DECEASED AT DEFENDANT'S APPROACH—OBJECT OF TURNING—CONCLUSION OF WITNESS.—Where the evidence showed that deceased was standing unarmed with others and was warned that defendant was approaching with a pistol, and turned around, when defendant came up and shot him three times, it was proper to refuse a question on cross-examination of a witness for the prosecution, whether at the time deceased turned round, "had he started back to renew the fight?" as calling for the conclusion of the witness.

APPEAL from a judgment of the Superior Court of Mendocino County, and from an order denying a new trial. John Q. White, Judge.

The facts are stated in the opinion of the court.

John W. Preston, and Ross Campbell, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

CHIPMAN, P. J.—Defendant was convicted of the crime of murder and sentenced to imprisonment for life. He appeals from the judgment on bill of exceptions.

It is complained that the court erred in giving the following instruction: "If you believe from the evidence that at the time of the killing, the defendant could with safety to himself have avoided such killing, and that the defendant knew, or as a reasonable man could have known, that he could with perfect safety to himself and his person have avoided such killing, then if you find all these facts, the defendant cannot justify such killing on the grounds of self-defense."

It is necessary to a right understanding and appreciation of the instruction objected to that the facts be stated. Defendant was a boarder in the house of one Gonelli and wife. On the afternoon of the day of the homicide there were also present five other Italians, named Cinquini, Falleri, Bonturi, Pardeni and Del Debbio, all of whom, except Del Debbio and Cinquini, were witnesses at the trial and were assembled in

the dining-room of Gonelli at the time of the homicide. Defendant was in an adjoining bedroom dressed, but lying on the bed. He called for a glass of water, which was sent to him by a little girl, whom he sent away, saying he wanted a glass of wine, which she took to him, and he then said he wanted to see Mrs. Gonelli. She went to the room, and soon came out crying and said defendant had struck her. Cinquini went into the room and struck defendant while lying on the bed and an altercation ensued. Falleri testified: "They scuffled out through Baldocchi room into the kitchen, where they were separated. I took hold of defendant and the others took Cinquini and went out through the kitchen on the porch." Defendant drew his revolver in the kitchen and made some threats that he would shoot Falleri if he did not let him loose, which Falleri did and defendant returned to his room, but in about two or three minutes jumped out through a window to the porch. Witness Falleri testified: "I went from the kitchen out on the porch and warned deceased that Baldocchi was coming with a pistol to shoot him. The defendant came around the corner of the house begun firing at deceased. Deceased was not doing anything and had his hands by his side. I did not see Cinquini (deceased) have any pistol or knife or weapon of any kind at any time; he did not make any motion to draw any weapon." Pardeni and Bonturi testified substantially as did Falleri up to and including the time of the separation of the parties in the kitchen. Both of them testified to the warning given by Falleri to deceased. They testified that deceased was standing between them, that they saw no weapon in his hands and that he made no motion to draw a weapon. Bonturi testified that his hands were down at his side; that he did not start toward Baldocchi nor make any motion to draw any weapon. Bonturi testified: "Deceased was standing with his back against the wall, Falleri came running out of the kitchen door and called to Cinquini to look out that Baldocchi was coming, with a pistol to shoot him. Cinquini just started to turn around when defendant came around the corner of the house and began shooting. He shot five times. . . . Cinquini fell at the first shot and Baldocchi kept shooting at him after he was down. He said as he was shooting 'take that' and 'are you satisfied?' One shot also struck Del Debbio. Defendant told us all to leave

or we would get some too." One shot took effect in the abdomen, another in the breast and a third in the mouth.

Defendant testified to the occurrence on the porch: "I jumped through the window of my room and came right around the porch, and when I got right to the corner I saw Cinquini. . . . I was going around to the corner to wash my face, and when I got to the corner I saw Cinquini, he had his hand in his pocket and he offered to shoot me and I shoot him first. . . . At the time I shot Cinquini he was standing between two men and had got his hand in his pocket. I was afraid of all of them. I thought Cinquini was going to shoot me, I saw he had a pistol in the house that day; I saw it in the morning. . . . I was five or six feet from him when I shot him. Cinquini did not say anything just dropped dead. I don't know whether he moved after I shot him the first time or not. I hit him in the stomach the first time where I aimed to shoot him. The next shot I shot him in the stomach. The next shot was, he was on the floor, I don't know that I hit him in the mouth. I don't know what became of that bullet that was shot toward the floor."

Appellant's contention is that the instruction complained of "eliminates entirely the right of defendant to stand his ground and places upon him the duty to flee when attacked." And it is argued that "in requiring retreat of defendant, the trial court impliedly found as a fact that appellant was the aggressor in the fatal combat, for this court has held that unless a party be the aggressor, he has the right to stand his ground and need not flee, and even in some cases this right is accorded the aggressor." (Citing *People* v. *Lewis,* 117 Cal. 191, [59 Am. St. Rep. 167, 48 Pac. 1088]; *People* v. *Newcomer,* 118 Cal. 263, [50 Pac. 405]; *People* v. *Maughs,* 149 Cal. 253, [86 Pac. 187].)

The cases showing under what circumstances it becomes the duty of the defendant to flee, and when he has the right to stand his ground and even to pursue his aggressor, are not to be misunderstood, for they leave no obscurity as to their meaning. The learned trial judge was not unmindful of these decisions nor did he deprive the defendant of their benefit, for he gave the following instructions: "I instruct you that the defendant has the right to stand his ground if assaulted, or threatened with an assault which might produce death or great bodily injury, and that he is not required to retreat

when so threatened or assaulted, from a place in which he has a right to be, even if such retreat would relieve him from the necessity of acting in self-defense. It is the law of this state that a man has the right to stand his ground if assaulted or pursued by another, even if to do so it becomes necessary to take the life of his assailant.'' Again, the court told the jury: ''I charge you that if the defendant believed that he was in imminent danger of being killed or of suffering great bodily injury, and the circumstances were such as to excite the fears of a reasonable man that to stand his ground would further imperil him, that he would have the right to pursue his adversary until he had secured himself from all danger.'' Read in connection with the foregoing, the instruction complained of is the statement of an obviously sound principle and could by no possibility have prejudiced the defendant. He had the benefit of the doctrine contended for to the fullest extent. Indeed, it may be doubted whether the facts as they appeared, even giving all reasonable weight to defendant's testimony, would warrant the application of the rule at all. Defendant commenced shooting as soon as he saw deceased, following up his brutal assault even after his victim lay prostrate before him. All that even defendant states as justification is that deceased had his hands in his pocket. He made no move to draw a weapon; he did not start toward defendant nor did he indicate any intention to assault defendant, whose fears seem only to have been based upon his having seen a pistol in the hands of deceased the morning of that day. The killing was a brutal, cold-blooded murder without semblance of justification on the ground of self-defense. To hold that the deceased was in any sense an aggressor would be a gross distortion of the facts. It is true that in the first altercation, when deceased assaulted defendant to avenge the insult to Mrs. Baldocchi, deceased was the aggressor. But that affair had ended, deceased was no longer an aggressor, and defendant had ample time to cool his blood. If it can be brought into the question at all, it tends to furnish the probable motive of the killing as having been in retaliation for the assault by deceased, who had ceased to be the aggressor.

Complaint is made that the court refused to give the instruction found at folio 71 of the transcript upon the weight to be given to evidence of previous good character. The court

instructed the jury fully and correctly upon the subject and was not called upon to repeat the instruction. Besides, the instruction asked stated: "I further instruct you that the jury have the right to say by their verdict, that the defendant's character outweighs the evidence against him, even if the evidence outside of the evidence of good character, conclusively establishes his guilt." It is difficult to see how such a statement of the law can be upheld. Evidence of good character comes to the aid of the presumption of innocence and is a fact to be proven, as tending in a greater or less degree to establish innocence, and cannot be put aside by the jury in order to ascertain if the other facts and circumstances, considered by themselves, do not establish guilt beyond a reasonable doubt, as the court instructed the jury. But where guilt is conclusively established, to say that evidence of good character alone will warrant a jury in acquitting the defendant is to turn the jury loose, without bridle or bit, to follow whatever whim may strike them. However this may be, it is sufficient to say that the jury were fully instructed upon the matter.

Witness Bonturi was asked on cross-examination this question: "At the time Cinquini had turned around, had he started back to renew the fight?" The court sustained an objection made on the ground that it calls for a conclusion of the witness. It would have been proper to ask the witness to state what deceased did when he turned around upon the approach of defendant and to ask the witness whether he started back, but it could not be assumed by the witness that it was to renew the fight or for any other purpose. Defendant did not attempt to ascertain further what deceased did at the time.

There are some other rulings objected to, but we find in none of them occasion for further comment.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.